# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| JAMES CLEVELAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:10-CV-305 |
| | ) | |
| MAPLE LEAF FARMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff James Cleveland alleges that his former employer, Defendant Maple Leaf Farms, terminated his employment either because he was disabled or because he was going to file a workers compensation claim. If proven, the former allegation would constitute a violation of the Americans with Disabilities Act, while the latter would constitute a violation of Indiana state law. Maple Leaf contends, however, that Cleveland was let go only because his position was eliminated, and it has now filed a Motion for Summary Judgment. For the reasons explained in detail below, Maple Leaf's Motion will be granted in part and denied in part.

## BACKGROUND

Maple Leaf is located in Milford, Indiana and is a "producer of duck products," meaning it makes food products that contain duck, one way or another. Cleveland, who is now 66 years old, began working for Maple Leaf in 2000 as a "Business Analyst." The summary description of the position outlined in the job posting was: "Position is accountable for working with users to understand business processes, develop and implement cost-effective process improvements; recommending technological and manual solutions, utilizing the most current technical resources." [DE 34-5.]

What this actually means remains something a mystery to me, which is part of the reason summary judgment is inappropriate at this time. The job's summary is quite broad, and you wouldn't necessarily guess from the summary alone that the position is in the Information Systems Department of Maple Leaf. In fact, it appears that the position was focused on technology issues, like addressing Y2K-related problems and implementing system-wide software changes.

One of the major projects Cleveland handled was the implementation of a total company management software system called Enterprise Resource Planning ("ERP"). The ERP system is a group of programs related to finance and accounting. This system would better enable Maple Leaf to track its business operations across its manufacturing plants in Indiana, Wisconsin, California, and Michigan. Implementing this system at each of these four sites required a significant amount of work for Cleveland. He would first do advanced planning and analysis at each location in order to coordinate each into the ERP framework. After this advanced planning, there would be developing, testing, and analysis and then finally a full implementation. The entire process of implementing the ERP system took around 8 years, and the last installation was at Maple Leaf's Eurasia Feathers plant in Grand Rapids, Michigan.

It was during the process of implementing the system at Eurasia Feathers when, on November 1, 2009, Cleveland suffered a stroke. Cleveland was hospitalized for a month and then spent another four months rehabilitating the use of the left side of his body. During that time Cleveland was on FMLA leave and received short-term disability through Maple Leaf. On March 22, 2010, Cleveland's treating physician at the Fort Wayne Neurological Center cleared Cleveland to return to work on April 7, 2010, with a recommendation that Cleveland be released

to return to work on a part-time basis without restrictions for two weeks and full-time thereafter. Cleveland returned to work with less-than-complete functioning of his left hand and left arm and some remaining strength issues with his left leg. He used a cane to help with balance, but could walk without the use of it. It is clear that Cleveland struggled, at least to some extent, with the physical effects of his disabilities at work. For instance, he slipped and fell on the steps outside of his office on May 13, 2010, though he was generally fine after this incident.

These disabilities were of sufficient concern that Maple Leaf's company nurse sent a letter dated June 11, 2010 to the Fort Wayne Neurological Center. The letter was addressed "To Whom it May Concern" and began, "This is in regards to James Cleveland. As Jim's employer, we have become very concerned with his safety here at the workplace." [DE 34-7.] The letter went on to discuss Cleveland's injuries and various "near falls" and stated that, because of his disabilities, Cleveland "is unable to fulfill the duties of his job description" and "is unable to fulfill his job duties," including "lifting up to 25 lbs." and regularly crossing the street between Maple Leaf's two offices. [*Id*.] The letter was written by Maple Leaf's company nurse and authorized by its Vice President of Human Resources. The letter was faxed to the neurological center, and the cover sheet attached to it, written by the company nurse, stated: "Per our conversation 06/10/10. Also, you may want to let the Dr. know that Jim only has 2 weeks of short-term disability left for this year and has used all 12 weeks of FMLA. Once his short-term disability runs out, he is eligible for long term disability, but will no longer be an employee of Maple Leaf Farms. Just an FYI." [DE 34-32.]

Cleveland found out about this letter soon after it was sent and he was understandably alarmed that his employer was communicating with his doctor without his knowledge. He

attempted to get some clarification about the letter and to correct what he thought were some inaccuracies in it, but he felt like he wasn't getting any real response from Maple Leaf. He therefore scheduled his own appointment at the neurological center on June 15, 2010. His doctor examined him and told him he was recovering on schedule and could still be at work without restrictions. The doctor also sent a follow-up letter to Maple Leaf stating, simply, "May Return to Work Without Restrictions." [DE 34-8.]

Cleveland continued working at Maple Leaf for the next month, though he still felt like he was being given the cold shoulder by his employer. Then, on July 14, 2010, he suffered two falls at work, one in the parking lot and another when he tripped over a shredder bin. Cleveland indicated he was fine and did not need any medical attention, though Maple Leaf's nurse did provide him with a bandage for his skinned elbow. The next day, on July 15, 2010, Maple Leaf decided to fire Cleveland. Maple Leaf argues it had concluded that it no longer had sufficient work for a business analyst position and that Cleveland thus needed to be let go. On July 20, 2010, Cleveland was handed a letter that stated: "We regret to inform you that the company has made the difficult decision to eliminate your position, effective July 20, 2010." [DE 34-35.]

At the time of his termination, Cleveland claims he was working on a variety of tasks that ranged from the big picture (strategizing about saving labor costs while waiting for future system upgrades) to the more mundane (taking help desk calls and loading sales histories). Maple Leaf argues that the fact that Cleveland was performing mundane tasks is evidence that it no longer had sufficient work for a business analyst and thus had to eliminate the position. Maple Leaf argues that by the time Cleveland returned to Maple Leaf, much of the work implementing the ERP system at the Eurasia Feathers plant was complete. Other employees in the Information

4

Systems Department had picked up where Cleveland left off and covered his work while he was out, and Maple Leaf has not hired a business analyst since it fired Cleveland. Cleveland argues, however, that the fact that software regularly has to be updated meant that there would always be work for a Business Analyst.

Cleveland initiated this lawsuit on August 31, 2010. His complaint stated a variety of causes of actions, but he has now voluntarily abandoned all but two: 1) a federal law claim that, in violation of the Americans with Disabilities Act, he was fired because of his disabilities related to his stroke; and 2) an Indiana state law claim that he was fired in retaliation for filing a workers compensation claim arising out of his July 14, 2010 falls at work.

## ANALYSIS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

**I.    ADA Claim**

The Americans with Disabilities Act prohibits employers from discriminating against disabled employees because of their disability. 42 U.S.C. § 12112(a). Congress enacted the ADA "against a backdrop of pervasive unequal treatment ... including systematic deprivations of fundamental rights" that people with disabilities were forced to endure. *Tennessee v. Lane*, 541

5

U.S. 509, 524 (2004) (examining Title II of the ADA). A disability is defined under the ADA as: (A) a physical or mental impairment that substantially limits one or more major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). The type of "major life activities" that must be substantially limited to fall under the purview of the ADA include, but are not limited to: caring for oneself, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2). Maple Leaf has conceded for the purposes of summary judgment that Cleveland's stroke-related disabilities have substantially limited his major life activities such that he qualifies as a disabled person under the ADA. *See* DE 35 at 6 (Maple Leaf has "conceded for purposes of summary judgment that Cleveland was a member of the protected class.").

In making a charge of discrimination under the ADA, a plaintiff may proceed under either of the two paths – the direct method and the indirect method – that are now ubiquitous in all sorts of employment discrimination cases. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Although these rote and often inflexible tests are under increasing criticism, *see Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) and *Good v. University of Chicago Medical Center*, 673 F.3d 670 (7th Cir. 2012), I will continue to adhere to them until told otherwise.

Cleveland argues that the direct method applies to his case. Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus. *Dickerson v. Board of Trustees of Community College District No. 522,* 657 F.3d 595, 601 (7th Cir. 2011). This type of evidence is rare, as it "essentially requires an admission by the decision-maker" that it took actions for unlawful reasons, *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003), and "employers are usually careful not to offer overt remarks revealing

6

discrimination." *Dickerson,* 657 F.3d at 601. The direct method of proof can thus also entail presentation of "'a convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011). But whether one has direct or circumstantial evidence, the focus of the direct method is whether the evidence "points directly to a discriminatory reason for the employer's action." *Id.* at 734, n.3.

In this case, Cleveland's argument is strongest when he tries to establish that a "convincing mosaic" of circumstantial evidence exists. Plaintiffs pursing this route may present any of three broad types of circumstantial evidence. *Id.* at 734. The first type includes evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second type is evidence showing that the employer "systematically treated other, similarly situated . . . employees better." *Id.* Finally, the plaintiff may point to evidence that he suffered an adverse employment action and that the employer's justification is pretextual. *Id*.

Cleveland's first piece of circumstantial evidence is that he was terminated within a few months of returning to work with his new disabilities and within a week of his July 14, 2010 falls at work. It is true that "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (internal citations omitted). The timing issue alone would thus likely be insufficient "to tie the events together," *Bermudez v. TRC Holdings,*

7

*Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998), and Cleveland needs to establish "other circumstances" surrounding Cleveland's date of termination that would raise an inference in Cleveland's favor about a potential causal link between his disability and his termination.

Giving Cleveland the benefit of the reasonable inferences here, he has pointed to sufficient "other circumstances" in this case to support a potential inference that his firing was discriminatory. Most importantly, if I read the June 11, 2010 letter Maple Leaf sent to the neurological center that treated and discharged Cleveland in the light most favorable to him – as I must at this stage – it could constitute evidence that Maple Leaf was seeking a way to fire him because of his disabilities. The letter states – inaccurately – that Cleveland was "unable to fulfill the duties of his job description" and "unable to fulfill his job duties" because of his disabilities. [DE 34-7.]

Maple Leaf counters that this letter was simply an attempt to get clarification about Cleveland's status and was in fact a specific response to the original work report issued by the neurological center in March of 2010 about Cleveland's status, which stated, "please call with questions or need for clarification." [DE 34-30.] This may very well be true. But on the other hand, it could be that a jury would reasonably find that this letter was an attempt by Maple Leaf to get his doctor to confirm that Cleveland was no longer able to perform the essential functions of his job – and thus circumstantial evidence of Maple Leaf's intent to fire him because of his disabilities. Moreover, Maple Leaf's assertion that this letter was proper because "the law allows an employer to make inquires or require medical exams of employees when it has a good faith belief formed in reliance upon objective evidence that the employee may pose a direct threat of harm to himself or others in the workplace" [DE 35 at 9] is hollow and unpersuasive

because the only case it cites for this legal proposition is not at all on point. *See EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1096 (6th Cir. 1998) (employer was warranted in contacting plaintiff's doctor where plaintiff, who claimed to be HIV-positive, "refus[ed] to provide necessary medical information from his own physician ... [or] to submit to a company-paid examination" that would allow his employer to determine whether the plaintiff posed a direct threat to the health of others).

In addition, Maple Leaf's letter was faxed to the neurological center, and the cover sheet attached to it is somewhat ambiguous and confusing. It states: "Also, you may want to let the Dr. know that Jim only has 2 weeks of short-term disability left for this year and has used all 12 weeks of FMLA. Once his short-term disability runs out, he is eligible for long term disability, but will no longer be an employee of Maple Leaf Farms. Just an FYI." [DE 34-22.] This strikes me as an odd thing to say. This was written by Maple Leaf's nurse and she has stated that no one had ever mentioned to her the possibility that Cleveland could be terminated. Nevertheless, the statement "he is eligible for long term disability, but will no longer be an employee of Maple Leaf Farms" is somewhat confusing, and giving Cleveland its reasonable inferences, could be construed as evidence supporting the idea that Maple Leaf may have been thinking about firing him for his disability.

Also playing in Cleveland's favor is circumstantial evidence that Maple Leaf's reason for firing him – *i.e.*, that it no longer needed a Business Analyst – could be pretextual. Most helpful for Cleveland in this regard is the somewhat ambiguous evidence about the scope of the "Business Analyst" position at Maple Leaf and the extent to which work was actually left for

9

him to do when he was fired. The job description for a Business Analyst describes a wide range of generally broad duties:

1. Develop work plans, including time line and budget considerations.
2. Analyze and document business systems practices and processes as related to business/applications systems/models.
3. Facilitate communication and issues resolution between functional, application and technical areas.
4. Collaborate with users to identify and implement short and long-term corporate information and/or technology needs.
5. Assist with identification and implementation of interfaces for externally developed software packages.
6. Recommend procedures for effective deployment of hardware and software.
7. Coordinate and support efforts related to application implementation for the users.
8. Protect and maintain confidentiality of information being processed.
9. Perform related duties as required.

[DE 34-5.]

Maple Leaf argues that the key work for its Business Analysts was the Eurasia Feathers project, and that once that project was finished and prepackaged utilities and programs were available, there was no longer a need for a business analyst. But the duties assigned to a Business Analyst, at least as outlined in the job description, appear much broader that these tasks. And in fact, it is clear that Maple Leaf had him working on a wide range of things when he was fired. To be sure, Maple Leaf argues that the vast majority of these tasks were below the requirements of a Business Analyst and that he was only working on these projects because they had no other work for him to do. But with the broad duties described in the Business Analyst job description, it is difficult to feel certain that Maple Leaf is correct when it argues, for instance, that "the process of taking sales data from the Eurasia plant and inputting it into the [Maple Leaf] system" is "not business analyst work" [DE 35 at 3], or that the work of a business analyst

10

is wholly distinct from the work of "Application Support Specialists" or "Lead Application Support Specialists."  Given the broad duties listed in the position description, the outlines of where a Business Analyst's work begins and ends are somewhat amorphous, at least if we view the facts in the light most favorable to Cleveland, and it seems like some of the work in the department could have been handled by multiple positions.  Indeed, all of the work Cleveland was handling or would have handled has just been picked up by others in the department: "Cleveland's primary responsibility was business analysis.  That function is no longer performed at Maple Leaf Farms in the way it was done during Cleveland's employment.  Any duties that Cleveland performed which continue to exist are distributed among other in the department as needed."  [DE 34-22 at 15.]  So with a wide description of duties for the Business Analyst position, and giving Cleveland the inferences to which he is entitled, it is possible a reasonable jury could conclude that Cleveland still had sufficient work to do when he was fired and that Maple Leaf's explanation to the contrary is a pretext to cover up the fact that it fired him because it no longer wanted to deal with his disabilities.

In the end, Maple Leaf may very well have fired Cleveland because it decided that it no longer had sufficient work for him to do.  But when I review the evidence in the light most favorable to Cleveland, it is also possible that Maple Leaf fired him because it didn't want to deal with his new disabilities.  On the evidence before me, I can't definitively conclude which of these two options is true, so a jury will have to decide.[1]

---

[1] Cleveland also argues that he can establish a claim under the indirect method of proof.  Because I have determined that there is a triable issue under the direct method of proof, I need not analyze the issue under the indirect method since the issue at trial will simply be whether Cleveland "suffered retaliation because of protected activity."  *See Schobert v. Ill. DOT*, 304 F.3d 725, 732 (7th Cir. 2002); *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994) ("[The McDonnell Douglas ] burden-shifting model applies to pretrial proceedings, not to the jury's evaluation of evidence at trial.").

## II.     Cleveland's *Frampton* Claim

Arising out of *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249 (Ind. 1973), Indiana law provides a cause of action if an employer terminates an employee in retaliation for filing a workers compensation claim. Cleveland contends he has a viable *Frampton* claim because he was injured at work on July 14, 2010 and Maple Leaf then made the decision to terminate him the very next day.

Cleveland had not yet filed a worker's compensation claim when he was terminated, but a *Frampton* claim can be viable under these circumstances if Cleveland can prove that Maple Leaf knew that Cleveland intended to file a claim. *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785-86 (7th Cir. 2005). The problem for Cleveland, however, is that he has presented no evidence that would indicate Maple Leaf should reasonably have been expected to think that Cleveland intended to file a claim. The injuries he suffered at work on July 14, 2010 were a result of two falls, one in the parking lot and another when he tripped over a shredder bin. All the evidence from Cleveland's deposition and contemporary emails of Maple Leaf employees shows that Cleveland indicated he was fine and did not need any medical attention. [*See*, *e.g.*, DE 30-5 at 39; DE 34-37.] It is true, as Cleveland points out, that Maple Leaf's nurse did provide him with a bandage for his skinned elbow. But is it really reasonable to believe that Maple Leaf was concerned that Cleveland intended to file a workers compensation claim for a skinned elbow when he indicated that he was otherwise perfectly fine? The answer is No. Cleveland's *Frampton* claim will therefore be dismissed.

**CONCLUSION**

Construing all inferences in his favor, there remain issues of material fact that could lead a reasonable jury to conclude that Maple Leaf fired Cleveland because of his disabilities. There are, however, no issues of material fact that could lead a reasonable jury to conclude that Maple Leaf fired Cleveland because it was concerned that he would file a workers compensation claim. Accordingly, Defendant's Motion for Summary Judgment [DE 29] is **GRANTED** in part and **DENIED** in part. This case will proceed to trial solely on Cleveland's claim that he was terminated in violation of the Americans with Disabilities Act.

**SO ORDERED.**

ENTERED: June 7, 2012

> s/ Philip P. Simon
> PHILIP P. SIMON, CHIEF JUDGE
> UNITED STATES DISTRICT COURT